VERNON DISTRIBUTING CO. *v.* UNITED STATES (No. 4653)[1]

[1] C. A. D. 463.

206

United States Court of Customs and Patent Appeals, June 26, 1951

*Lawrence, Tuttle & Harper* (*Lawrence A. Harper* and *George R. Tuttle* of counsel) for appellant.

*David N. Edelstein,* Assistant Attorney General (*Alfred A. Taylor, Jr., Richard E. Fitzgibbon,* and *Richard F. Weeks,* special attorneys, of counsel), for the United States.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, entered in conformity with its decision, C. D. 1244, overruling the importer's protest against the assessment and collection of certain internal revenue taxes imposed by the Collector

of Customs at the port of Los Angeles, California, upon certain rum imported from Cuba in May 1940. The entry was liquidated February 6, 1941, and the original protest was filed February 20, 1941.

The tax was assessed on the wine gallon basis under section 2800 (a) (1) [1] of the Internal Revenue Code (Title 26 U. S. C., 1940 edition), which, as it read at the time of the importation, provided:

\* \* \* There shall be levied and collected on all distilled spirits (except brandy) in bond or produced in or imported into the United States an internal revenue tax at the rate of $2.25 (and on brandy at the rate of $2.00) on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the distiller or importer when withdrawn from bond.

For some unexplained reason the case was not taken up for trial until February 25, 1948. On that date the protest was amended. Its provisions as amended, excluding claims alleged but not relied on at the trial, are stated in the brief for appellant as follows:

In the protest as filed, plaintiff alleged generally that the tax on this rum "should not exceed the internal-revenue tax imposed on the dates of" several trade agreements "or that imposed in respect of a like domestic article." Also, it was specifically claimed that rum is taxable at $2 per gallon by virtue of the Haitian trade agreement, T. D. 47667, and the initial Cuban trade agreement, T. D. 47232.

Prior to trial, the protest was amended by adding the claim that "the internal-revenue tax was improperly assessed"; that the rum was taxable "at the rate of $2 per gallon," and that under the initial Cuban agreement, T. D. 47232:

. . . as amended by article III of the Cuban trade agreement of December 18, 1939 (T. D. 50050) . . . underproof rum imported in containers holding each one gallon or less is subject to internal-revenue tax upon the basis of the proof gallon rather than the wine gallon . . .

In lieu of testimony a stipulation of facts was presented which is quoted in the decision of the trial court as follows:

\* \* \* the rum covered by this protest was produced in Cuba by a process of distillation at 160 degrees proof, or over, and from fermented black strap molasses. Thereafter it was stored in oak barrels for aging and after aging, caramel was added as a color agent to such of the rum as is described in the consular invoice as "Gold." It was then reduced in proof to 89 degrees by the addition of water, placed in bottles containing less than one gallon each, and shipped to the United States; that like rum was produced in the United States from fermented black strap molasses by a process of distillation and at a proof of approximately 190 degrees; it was stored in oak barrels and in bonded warehouses for aging and after aging was withdrawn from bonded warehouses at 100 degrees proof or over and the Internal Revenue Tax paid thereon upon the basis of the number of proof gallons so withdrawn. It was then reduced in proof to approximately 86 degrees by the addition of water and placed in bottles containing less than one gallon each. Also, after withdrawal from warehouse, and prior to reduction in proof, caramel was added as a coloring agent to such of said rum as was like the "Gold" rum referred to above, and rectification tax was paid thereon.

[1] Section 710 of the Revenue Act of 1938.

It appears from the record and briefs that, as amended, the claims of the protest covered several grounds but only two were pressed before the trial court.

The first of these was that the imported rum should not have been assessed with an internal revenue tax higher than two dollars per gallon, the amount said to have been assessable under the Internal Revenue Act of 1934 at the time of the effective date of the first reciprocal trade agreement between the United States and Cuba, which trade agreement was embodied in T. D. 47232, 66 Treas. Dec. 189. After the instant suit had been initiated, but before it was tried in the Customs Court, other suits involving this first ground had arisen and had been decided adversely to the contention of appellant in this case. Included were the cases of *United States* v. *Rathjen Brothers*, 31 C. C. P. A. (Customs) 70, C. A. D. 250, 137 F. (2d) 103; and *United States* v. *Schenley Import Corp.*, 31 C. C. P. A. (Customs) 74, C. A. D. 251, decided by this court; and *Sawelson Wholesale Co.* v. *United States*, decided by the Customs Court, C. D. 973, 15 Cust. Ct. 202. In its decision in the instant case the trial court directed attention to the two cases decided by us, and in the brief before us counsel for appellant concede the adverse decisions, but say:

* * * inasmuch as one of the parties [in the instant case] may seek review by the Supreme Court of the United States, because of the international importance of the question involved, the first issue is also presented by this appeal, but counsel will not here now argue the points involved, since they have already been passed upon by this court.

In view of this attitude it is unnecessary for us to discuss the first ground covered by the claims of appellant's protest, or to refer to it, except to say, in view of a possible appeal, that we adhere to the views expressed in the two decisions by us. Since the *Sawelson* case referred to has never been before us, we express no opinion concerning it, further than to say that apparently it is in harmony with our decisions in the *Rathjen Brothers* and *Schenley Import Corp.* cases, *supra*.

So, here we are concerned with only appellant's second ground of protest, which is that the internal revenue tax should have been assessed upon the number of *proof* gallons rather than upon the number of *wine* gallons imported.

This contention is predicated upon a reciprocal trade agreement between the United States and Cuba supplemental to and amendatory of the original agreement of 1934 referred to hereinbefore. The supplemental agreement, which is embodied in T. D. 50050, 75 Treas. Dec. 221, was proclaimed by the President of the United States December 18, 1939, and hence was in effect at the time of the importation here involved—May 1940.

In the brief for appellant it is pointed out that the third paragraph of Article III of the supplemental trade agreement reads:

Articles the growth, produce or manufacture of the Republic of Cuba enumerated and described in Schedule II annexed to this Agreement *shall*, on their importation into the United States of America, *be exempt from all* duties other than ordinary customs duties and all *taxes*, fees, charges or exactions, imposed on or in connection with importation, *in excess of those imposed on September 3, 1934, or required to be imposed thereafter by laws of the United States of America in force on September 3, 1934.* (Italics supplied by us.)

The paragraph was new in the supplemental agreement and in the brief for appellant it is asserted that, since the tax in force on September 3, 1934, was "$2 on each proof or wine gallon when below the proof," if the paragraph stood alone, the proper tax on each of the imported bottles of rum containing one gallon or less should have been "$2 per wine gallon," because it was below proof. Thereafter the brief says:

\* \* \* However, paragraph 3 did not stand alone. The same agreement contained a domestic-equivalent clause in paragraph 5, which permitted an increase of tax to the extent of "a charge equivalent to an internal tax imposed in respect of a like domestic article." To quote (italics supplied [by counsel for appellant]):

5. *The provisions of* Article I and Article III of this Agreement and of *the third paragraph of this Article* shall not prevent the *Government of the United States of America from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article* or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part.

This paragraph also was new in the supplemental agreement which, as has been stated, was in effect at the time of the involved importation in May 1940, and the brief for appellant argues:

In short, since the importation lived up to the specification of the trade agreement in that it consisted of bottles of rum, containing each 1 gallon or less, it was entitled to be assessed either at $2 per wine gallon or a charge equal to the internal tax imposed on like domestic bottles of rum, containing each 1 gallon or less.

In discussing the nature of the difference between the assessment made by the collector and that which is claimed to be proper, the brief for appellant states:

The assessment was made on the basis of a wine gallon. By section 186.148, 26 CFR, a "wine" gallon is defined as a standard United States gallon containing 231 cubic inches. The standard is that of size alone.

A "proof" gallon, however, is defined by section 186.149 as a wine gallon containing 50 percent alcohol by volume and 50 percent water. Therefore, a "proof" gallon, which is also known as 100 proof, is 231 cubic inches of an equal mixture of alcohol and water.

Underproof spirits contain less than 50 percent alcohol. For example, 90-proof rum consists of 45 percent alcohol by volume and 55 percent water.

Applied to the present merchandise, 89-proof rum, a tax of $2.25 per wine gallon is $2.25 for every 231 cubic inches. A tax of $2.25 per proof gallon on the same 231 cubic inches of 89-proof rum is only 89 percent of $2.25, or a tax of $2.0025.

Upon the basis of the figures so recited, it is contended on behalf of appellant that there was a discrimination against the rum imported from Cuba violative of what the brief designates "the domestic-equivalent" clause of the supplemental trade agreement expressed in the third paragraph of Article III, *supra*.

On the other hand, in the brief on behalf of the Government it is contended "that a careful analysis of the taxing statute will clearly demonstrate that there is no discrimination in the rates fixed therein against imported distilled spirits or in favor of domestic spirits," and the brief asserts that:

* * * it can be readily demonstrated that the amount of tax paid by the under-proof imported rum is equivalent to but not more than the tax paid on the domestic rum after rectification. The tax paid on the imported rum is $2.25 per wine gallon. It is 89 degrees proof. The tax paid at the same rate per proof gallon on domestic rum at 190 proof is 1.9 x $2.25 or $4.275. In reducing said 190 proof rum to 89 degrees proof a rectification tax of .30 per proof gallon is charged. This tax on 190 proof rum is 1.9 x .30 or 57 cents per proof gallon. So that the total tax on the domestic rum is $4.845 per gallon at 190 proof. When the 190 proof rum is reduced to 89 proof enough water is added to bring the alcoholic content down to 44.5 percent by volume. Thus, by dividing 190 by 89 we find that the new volume of rum at 89 degrees proof is 2.134 gallons. We thus have 2.134 gallons of rum that paid a tax of $4.845, or at the rate of $2.27 per gallon. Therefore, the domestic rum at 89 proof paid a higher tax than the imported rum at 89 proof.

A reply brief was filed on behalf of appellant in which it was argued, in effect, that there was a basic fallacy in the Government's argument, but we do not find any challenge of the accuracy of the calculation just quoted.

In the course of its decision the trial court said:

* * * an analysis of the taxing statute here involved will disclose that no discrimination exists in the rates fixed as between imported distilled spirits and domestic spirits. A single rate of tax is provided for but is made applicable to two distinct products, i. e., (1) distilled spirits over proof, and (2) distilled spirits below proof. The tax becomes effective when such spirits are produced in the United States or imported into the United States. Under the law no discrimination exists. When distilled spirits are produced in this country over proof or are imported over proof, the tax is to be based upon the proof gallon. When produced in the United States under proof or imported under proof the tax is based on the wine gallon. In view of the wording of the taxing statute which distinguishes between the two kinds of distilled spirits, viz, those that are over proof and those that are under proof, the contention of the plaintiff that they are similar for purposes of taxation cannot be successfully maintained.

It is said in the brief for appellant that "In applying the domestic-equivalent basis of internal-revenue taxation, the proper procedure is to ascertain the *amount of tax with which the like domestic article is assessed*." (Italics supplied by us.)

Assuming that to be a correct statement of the law, we fail to discern wherein there was a failure to comply with it in the instant case, except that according to the calculation in the brief for the

Government, *supra*, a slightly larger *amount* ordinarily was collected on the domestic rum than that actually collected on the imported rum here involved. Indeed, it seems to us that a result is being sought here whereby appellant would be taxed in an amount much less than that imposed upon a domestically produced rum, particularly when large quantities of imported rum are involved.

In the brief on behalf of appellant it is said:

Domestic rum must necessarily come into existence at more than proof because by regulation (26 CFR, 187.4), rum is defined as "any alcoholic distillate . . . distilled at less than 190 degrees of proof . . . and withdrawn at not less than 150 degrees of proof."

Consequently, all rum produced in the United States is withdrawn from the distillery at over proof. If the tax is then paid (under 26 USC 2883) it is paid on the proof gallon (26 USC 2800 (a)). Even if the tax is not then paid, section 186.135 provides that *reduction in proof* on warehouse premises *is to take place after* the spirits have been gauged for withdrawal from the internal-revenue bonded warehouse. If the reduction in proof occurs outside the warehouse, it takes place under section 189.77 which permits *taxpaid* spirits to be reduced "to the desired proof for bottling." Thus, however the reduction in proof is handled, the internal-revenue tax is collected on the proof gallon. (Italics quoted.)

Whether or not the laws of Cuba render it necessary to produce rum at "more than proof"—that is, as we understand it, having more than 100 parts alcohol—we are not advised, but from the stipulation, *supra*, it appears that the particular rum here involved was produced in Cuba by a process of distillation so that it was 160 degrees proof or over. Had it been imported into this country in that condition, as it might have been, it would have been assessed with an internal revenue tax upon the proof or degree basis, precisely the same basis as that applied in the case of a domestic product. The statute so provides where alcoholic degrees of 100 or more are made the measuring factor.

However, the rum was not imported in its distilled condition. By means of water it was reduced in strength to an 89 degree alcoholic content and imported in that condition. By the terms of the statute, therefore, it became subject to wine gallon measure just as domestic rum would be if no internal revenue tax were imposed upon it until after its alcoholic strength had been reduced to less than 100 degrees by the addition of water.

It is obvious that the amount of revenue derived from an assessment based on a proof gallon of 89 degree rum would be less than that derived from an assessment based upon a proof gallon of 160 degree rum. It is not reasonable to suppose that Congress intended to discriminate against domestic rum. We are of opinion that the new matter, hereinbefore quoted, contained in the fifth paragraph of Article III of the supplementary agreement between the United States and Cuba amending Article VIII of the original 1934 trade agreement between the two countries makes it abundantly clear that no

discrimination as to either against the other should take place during the life of the supplementary agreement. For convenience, we here repeat the text of the paragraph:

The provisions of Article I and Article III of this Agreement and of the third paragraph of this Article shall not prevent the Government of the United States of America from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part.

There seems to have been some confusion as to the correct meaning of the word "like" as used in the statutes, the trade agreements and the stipulation, *supra*. So far as rum—the only product involved in this case—is concerned, there is, of course, a similarity between rums having different degrees of strength, but for tariff purposes 89 degree rum is not "like" 160 or 190 degree rum. As felicitously expressed by the trial court "[they are] two distinct products, i. e., (1) distilled spirits over proof, and (2) distilled spirits below proof."

The distinction was specifically provided for in the statute under which the here involved tax was assessed by the clause "on each [1] proof gallon or [2] wine gallon *when below proof*."

There is some argument by counsel for the respective parties relating to the proper interpretation of the phrase "in respect of a commodity from which the imported article has been manufactured or produced in whole or in part" appearing in the fifth paragraph of Article III of the supplementary agreement with Cuba, *supra*.

Upon this we deem it sufficient to say that we agree with the statement in the brief for the Government to the effect that the addition of water to over proof rum, thus reducing its alcoholic content, is not a manufacturing process within the sense of the trade agreement.

In the course of the brief for appellant reference was made to a decision of the Supreme Court of the United States, *Jordan* v. *Roche*, 228 U. S. 436, relating to bay rum which came into the United States from Puerto Rico under what was commonly known as the Foraker Act, 31 Stat. 77. We find nothing in the decision which we regard as helpful to appellant's cause. The same is true of the decision of the United States Circuit Court of Appeals, Ninth Circuit, in the case of *Parrott & Co.* v. *United States*, 156 F. (2d) 943.

We find no error in the judgment appealed from and it is *affirmed*.

---

## DECISION ON MOTION TO REOPEN

March 18, 1952

GARRETT, Chief Judge.

On July 30, 1951, after the decision in this case filed June 26, 1951, had been forwarded to counsel for the respective parties, a petition

for rehearing was filed on behalf of appellant. Opposition to the petition was filed on behalf of the Government on August 9, 1951, and on September 28, 1951, the court, having considered the petition and being of opinion that it presented no ground which would justify any change in the conclusion, denied it without written opinion. The decision filed June 26, 1951, was thereafter published as C. A. D. 463 in Treasury Decisions Advance Sheets of October 11, 1951, beginning at page 30 thereof.

Subsequently, with the permission of the court, there was filed on behalf of appellant a motion to reopen the case, in which it was prayed that the denial of appellant's petition be set aside, etc. We granted permission for the filing of briefs and for oral argument on the motion. The oral argument was heard on February 7, 1952. It was reported by a stenographer employed by appellant and transcripts were furnished the court. So, in restudying the case we have had the benefit both of briefs and of written copies of the oral arguments.

At the outset of his oral statement counsel for appellant said:

First I will say that the appeal relates to rum imported from Cuba, invoiced and described as white rum and as gold rum. At this moment, if the proceedings are in such form that the Court may accept an abandonment of any part of the issue here, I do abandon the appeal in so far as it relates to the gold rum.

We know of no reason why the abandonment should not be permitted and accordingly dismissal of this appeal as to the so-called gold rum is formally stated hereinafter.

The record in the case is a meager one. No testimony was taken, nor was any other kind of evidence introduced at the trial, except that counsel for the respective parties entered into a stipulation as to facts. This was done at a proceeding before a judge of the Customs Court sitting at San Francisco, California, February 25, 1948.

Incidentally, it may be repeated here that the merchandise was entered at Los Angeles, California, May 16, 1940.

As may be seen, the stipulation was quoted in full in our decision of June 26, 1951, but it was not analyzed closely in the opinion. In view of appellant's abandonment of the appeal as to gold rum and for other reasons, a restudy of the stipulation has been made, and it is deemed proper to set forth an analysis of it in greater detail than originally seemed necessary.

The stipulation was proposed by counsel representing appellant.[1] For convenience, we here repeat the text and quote the proceedings incident to its introduction.

Mr. Carpeneti [counsel for appellant]: If Your Honor please, this case involves rum imported from Cuba and which is designated as either White rum or Gold rum.

At this time I offer to stipulate that the rum covered by this protest was produced in Cuba by a process of distillation at 160 degrees proof, or over, and from

[1] Different counsel from those who appeared for the respective parties at the trial argued the case before us.

fermented black strap molasses.   Thereafter it was stored in oak barrels for aging and after aging, caramel was added as a color agent to such of the rum as is described in the consular invoice as "Gold."   It was then reduced in proof to 89 degrees by the addition of water, placed in bottles containing less than one gallon each, and shipped to the United States; that like rum was produced in the United States from fermented black strap molasses by a process of distillation and at a proof of approximately 190 degrees; it was stored in oak barrels and in bonded warehouses for aging and after aging was withdrawn from bonded warehouses at 100 degree proof or over and the Internal Revenue Tax paid thereon upon the basis of the number of proof gallons so withdrawn.   It was then reduced in proof to approximately 86 degrees by the addition of water and placed in bottles containing less than one gallon each.   Also, after withdrawal from warehouse, and prior to reduction in proof, caramel was added as a coloring agent to such of said rum as was like "Gold" rum referred to above, and rectification tax was paid thereon.

Mr. Vitale [counsel for Government]: After conferring with the customs officials at this port, the government is willing to consent or agree to that stipulation of facts.

In the oral argument before us counsel for the Government characterized the stipulation as being "in burdensome language," and also stated that "the Government made him [counsel for appellant] add that awkward statement at the bottom [meaning, as we understand it, the last sentence of the stipulation], because we wanted to show that as far as the gold rum was concerned, to which caramel was added, a rectification tax was paid."   Aside from the last sentence the phraseology is understood to be that of counsel then representing appellant.

Before us the stipulation has been differently interpreted by counsel for the respective parties; so, manifestly, it is ambiguous.   This is unfortunate and, since the burden rested upon importer to establish error on the part of the collector, we are unable to understand why importer's counsel was willing to submit the case without clear and easily understandable proof of salient facts.   It is the function of courts to determine the law applicable under a given state of facts, but where reliance as to facts is placed solely upon a stipulation and counsel are themselves unable to agree as to what facts are stipulated, the courts find themselves in a most perplexing and disagreeable situation.   When a litigant is unable to obtain from an opponent a clear cut and unequivocal stipulation of salient facts, he should take testimony or supply other admissible evidence to establish them, and such facts should be presented before the courts are called upon to decide the case.

In the instant case counsel do not agree as to the factual meaning of the stipulation, which is the only evidence that was relied upon at the trial before the Customs Court and, of course, before this court—that is, until after our decision of June 26, 1951, when matter was presented in the petition for rehearing to which we hereinafter refer.

Before proceeding to an analysis of the stipulation, we will make reference to a contention by counsel for appellant that there was

error in a statement in our decision of June 26, 1951, to the effect that adding water to what may be called raw rum, whereby the proof degree of such rum is reduced, constitutes a rectification process and makes applicable a rectification tax of 30 cents per gallon in addition to the other Internal Revenue tax. Specifically, the alleged error is asserted to be embraced in certain clauses of a paragraph which we quoted from the Government brief in our original decision. See page 8 of typewritten copy and page 34 of the Treasury Decisions Advance Sheets identified, *supra*.

We here reproduce the quoted paragraph, italicizing the clauses in question:

\* \* \* it can be readily demonstrated that the amount of tax paid by the under-proof imported rum is equivalent to but not more than the tax paid on the domestic rum after rectification. The tax paid on the imported rum is $2.25 per wine gallon. It is 89 degrees proof. The tax paid at the same rate per proof gallon on domestic rum at 190 proof is 1.9 x $2.25 or $4.275. *In reducing said 190 proof rum to 89 degrees proof a rectification tax of .30 per proof gallon is charged.* This tax on 190 proof rum is 1.9 x .30 or 57 cents per proof gallon. So that the total tax on the domestic rum is $4.845 per gallon at 190 proof. *When the 190 proof rum is reduced to 89 proof enough water is added to bring the alcoholic content down to 44.5 percent by volume.* Thus, by dividing 190 by 89 we find that the new volume of rum at 89 degrees proof is 2.134 gallons. *We thus have 2.134 gallons of rum that paid a tax of $4.845, or at the rate of $2.27 per gallon.* Therefore, the domestic rum at 89 proof paid a higher tax than the imported rum at 89 proof.

In the motion to reopen, the foregoing is immediately succeeded by the following comment:

Appellant's counsel now asserts, as they have consistently asserted heretofore [the matter was referred to as error in the petition for rehearing but it was not deemed to have the importance which appellant ascribes to it], that the above quoted statement is erroneous. It is erroneous in several respects but of most importance in this regard:

(a) The 30¢ rectification tax is never charged for the act of reducing the proof of distilled spirits, including rum, by the addition of water.

(b) Hence rum produced at 190 proof, withdrawn from bonded warehouse at 100 proof or over, tax paid at the rate of $2.25 per proof gallon, and then reduced to 89 proof by addition of water *only*, has paid a tax equal to $2.0025 per wine gallon, not $2.27 as said by appellant. (Italics quoted.)

Further argument was presented in connection with the written motion to reopen and the subject matter was extensively discussed in the oral argument before us, the general purport of the argument and discussion by counsel for appellant being that the court was misled by the statement quoted from the original brief on behalf of the Government.

Counsel for appellant seems to have been aggrieved because we deemed the petition for rehearing without merit.

We have assumed it to be generally believed that mixing only water with rum produced by distillation from black strap molasses is not regarded as a rectifying process, although there is nothing in the

stipulation which so states, and appellant offered no proof upon that point. In frankness it must be said that we did not fully realize that the phraseology which we quoted from the brief on behalf of the Government might be construed as a claim that such a mixing of water and alcohol constituted rectification as that term is understood in the rectifying art. Other matters which seemed to us of graver consequence tended to distract attention from that phase of the controversy. Realizing now that our view might be, in fact has been, misunderstood by reason of the quoted matter, we take occasion to make it clear that we do not regard a mixture consisting of nothing more than water and raw rum as being rectified rum.

However, it does not follow from this explanation or correction, or whatever it may be designated, that appellant is entitled to a favorable judgment upon the record presented.

Other factors require consideration.

We deem it fair to state that in the proceedings subsequent to the filing of appellant's petition for rehearing counsel for the Government have made it clear that, to quote from the memorandum in opposition to the motion to reopen, they "agree that the rectification tax is never charged for the act of reducing the proof of distilled spirits by the mere addition of water," but counsel also assert the following in the memorandum:

The Government has never agreed and does not concede here that any rum is produced in the United States without the payment of a rectification tax. Hence our calculation that the amount of tax paid on domestic rum at the rate of $2.25 per proof gallon plus 30¢ per proof gallon rectification tax on a wine gallon basis equals $2.27 was correct. Since the imported rum paid a tax of $2.25 per wine gallon, there was no discrimination in favor of the domestic rum.

This constitutes a direct challenge to the findings of fact upon the basis of which appellant seeks recovery.

On the motion now before us, styled "MOTION TO REOPEN, AMEND THE DECISION AND RECONSIDER THE JUDGMENT," the gravamen of appellant's argument appears to be based upon an interpretation of the stipulation to the effect that it was therein agreed that there was produced *in the United States* not only rectified rum like the gold rum in the importation, which admittedly would be subject to a rectification tax, but that there was produced also rum like the white rum in the importation, which, it is insisted, would not be subject to a rectification tax, and because such domestically produced unrectified rum would not be subject to such tax the unrectified rum imported from Cuba is not subject to it by reason of Article III of a trade agreement proclaimed December 18, 1939, in T. D. 50050, 75 Treas. Dec. 221, which was supplemental to and amendatory of a prior trade agreement which was embodied in T. D. 47232, 66 Treas. Dec. 189.

The insistence is, as may be seen from our original decision, that because the imported rum (it appears to have been imported in bottles

containing less than a gallon) was assessed on the wine gallon basis—that is, it was assessed at $2.25 per wine gallon—it was discriminated against in contravention of the trade agreement and that it should have been assessed on the proof gallon basis—that is, at only 89% of $2.25 or $2.002 per gallon.

The theory underlying all the argument on behalf of appellant obviously is that the presumption of correctness which attached to the action of the collector has been overcome by appellant, and it is proper to consider that matter at this point.

We have stated already that counsel for the respective parties disagree at to the meaning of the stipulation and that obviously it is ambiguous. The interpretation of counsel for appellant has been given. In the oral argument before us on the motion to reopen counsel for the Government presented the following view:

> Now I submit that under this stipulation the Government agreed that there was rum produced in the United States which was like the gold rum imported from Cuba. I submit that this stipulation does not agree that there is any rum produced in the United States which is like the white rum produced in Cuba.

> Mr. Tuttle [counsel for appellant] has cited several cases in his brief before this Court on the construction of sentences and the law. I would like to read you what he said in the Irwin case. It is quoted on page 7 of Mr. Tuttle's brief:

>> To the same effect see *Irwin* v. *United States*, 2 Ct. Cust. Appls. 296 at page 297. Crawford, *The Construction of Statutes* (1940) section 193 at page 331 declares, 'It may be stated as a general rule that a qualifying or relative word, phrase, or clause, such as "which," "said," and "such," is to be construed as applying to the word, phrase, or clause next preceding, or, as is frequently stated, to the next preceding antecedent, and not as extending to or including others more remote, unless a contrary intention appears.'

> That is just as applicable to the Government's contention in this case as it is to the importer's contention. I direct your attention to the stipulation of fact. It is repeated on page 4 of Mr. Tuttle's brief. It states:

>> At this time I offer to stipulate that the rum covered by this protest was produced in Cuba by a process of distillation at 160 degrees proof, or over, and from fermented black strap molasses. Thereafter, it was stored in oak barrels for aging and after aging, caramel was added as a color agent to such of the rum as is described in the consular invoice as 'gold.' It was then—

> I submit those three words can refer to nothing but the gold rum—

>> It was then reduced in proof to 89 degrees by the addition of water, placed in bottles containing less than one gallon each, and shipped to the United States—

> now the next three words—"that like rum"—those three words can refer to nothing else except the gold rum which is described immediately preceding, and to be sure that is what the Government meant, the Government made him add that awkward statement at the bottom, because we wanted to show that as far as the gold rum was concerned, to which caramel was added, a rectification tax was paid. Now continuing:

>> Also, after withdrawal from warehouse, and prior to reduction in proof, caramel was added as a coloring agent to such of said rum as was like 'gold' . . .

> I submit there isn't one thing in that whole stipulation as to the manufacture of white rum either in Cuba or in the United States, that whole stipulation has to do with the manufacture of gold rum in Cuba, and gold rum in the United States.

Now I have stated, as Mr. Tuttle told you, in opposition to this motion that I do not believe there is any rum produced in the United States upon which a rectification tax is not paid; and this pamphlet that Mr. Tuttle refers to today does not convince me otherwise.

The pamphlet mentioned is entitled "STATISTICS ON DISTILLED SPIRITS AND RECTIFIED SPIRITS AND WINES (Fiscal Year Ended June 30, 1950)." It purports to have been issued by the Alcohol Tax Unit of the Internal Revenue Bureau of the United States Treasury Department. It is marked "FOR RELEASE AFTERNOON NEWSPAPERS Tuesday, October 24, 1950."

The court is asked to take notice of a table, numbered 18, on page 22 of the pamphlet as a matter of judicial knowledge and, in effect, to treat it as evidence that approximately 208,000 wine gallons of "American unrectified rum" was bottled in the United States during the fiscal year 1950. Counsel for appellant thus would supplement the stipulation relative to facts by matter presented for the first time in the motion to reopen.

When, during the oral argument of counsel for appellant, his attention was directed to the fact that the court had no such information at the time its decision of June 26, 1951, was prepared and handed down, counsel responded:

May I say, Judge Garrett, that the point I am discussing now, *and in a critical way, sir, was not raised, was not before anybody until about two weeks ago.* I now have reference only to the last brief the Government filed, and I have told you, before referring to the details, that the Government has bandoned its first statement that water is rectification. It has not reiterated its second statement that under the stipulation they had the right to assume that caramel was added, but it has shifted to a third statement, and of course, if the statement were true, if all rum which is produced in the United States is rectified, this would then be a moot case. (Italics supplied by the court.)

Assuming, without holding, that the court properly might look to the cited matter, it is difficult to discern how what occurred in 1950 could throw any light upon what occurred in 1940, the year in which the importations here involved were made. In his oral argument counsel for appellant stated:

* * * *I didn't take 1940 or 1941, when these goods came in, because at that time the reports were not as definite. You have to get the facts by a process of deduction.* In the 1950 report they unqualifiedly show the quantity of unrectified rum bottled at these two different places. (Italics supplied by the court.)

Even as to 1950 figures counsel for the Government suggested in the oral argument a belief that the unrectified rum which was bottled in the United States was in fact rum which had been imported after it had become under proof rum as a result of water being added to it.

We do not regard this suggestion of Government counsel as "far-fetched" or unreasonable, but however that may be, we are unable to arrive, "by a process of deduction," at the conclusion that because

some rum may have been produced and bottled in the United States in 1950 upon which no rectification tax was paid it follows that some such was produced and bottled in 1940. We are not convinced that appellant has met the burden which rested upon it of overcoming the presumption of correctness which applied to the official acts of the Collector of Customs.

For convenience, we here repeat section 2800 (a) (1) of the Internal Revenue Code (Title 26. U. S. C., 1940 edition) which was in force at the time the involved importations were made:

\* \* \* There shall be levied and collected on all distilled spirits (except brandy) in bond or produced in or imported into the United States an internal revenue tax at the rate of $2.25 (and on brandy at the rate of $2.00) on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the distiller or importer when withdrawn from bond.

Concededly, the rum which appellant imported was below proof—that is, it contained less than 50 per cent alcohol. As distilled from the black strap molasses in Cuba it was 160 degree rum. Had it been imported in that condition, the tax upon it would have been based upon the proof gallon just as the tax upon 160 degree rum produced in the United States, if any such, would have been. It was not so imported. By the addition of water before importation (whether rectified or not) it was reduced to 89 degree rum. The amount of water exceeded the amount of alcohol; hence it was below proof and by the express terms of the statute, *supra*, it was required that the tax be assessed upon the wine gallon basis which is defined in the regulations as a standard United States gallon containing 231 cubic inches. This, of course, would be true of domestically produced rum in which the amount of water exceeded the amount of alcohol. So, there is no discrimination. To hold with appellant here would have the effect of nullifying an express statutory provision.

As has been stated, *infra*, we denied appellant's petition for rehearing without written opinion. We follow this practice regularly when denying such petitions unless some presentation is made in the petition which seems to require discussion in clarification of expressions in our original opinion. It was our view that no such presentation was made on behalf of appellant in this case. Hence our action.

Upon restudying the case in the light of the motion to reopen, however, we have concluded that some comment upon matter presented in connection with the petition may be of sufficient interest to justify it. So far as the merits are concerned, they are deemed to be sufficiently covered by what already has been said, *infra*.

Throughout the argument in support of appellant's petition for rehearing there ran the thought that counsel for the Government had misled the court and by misleading us had caused us to hold,

in effect, that mixing water and what we have herein called raw rum constituted a rectification process. So, counsel for appellant devoted his efforts to combatting the correctness of what he designated the misleading statements of counsel for the Government. In so doing, counsel for appellant restated his interpretation of the stipulation, and directed our attention to the fact that the stipulation had been supplemented by other matter presented for the first time with the petition for rehearing. We quote from the argumentative portion of the petition:

The government cited no authority for its statement that reduction in proof by the addition of water caused payment of the 30-cent tax. When preparing the case for trial, counsel for appellant understood that the addition of water to rum had not been considered "rectification," at least as far back as 1880, when *US* v. *32 Barrels Spirits* was decided. Upon receipt of the court's opinion, and in order to verify their understanding, counsel for appellant caused inquiry to be made on this point directly of the Alcohol Tax Unit, Bureau of Internal Revenue, Washington. That office advised that the reduction in proof of rum, solely by the addition of water, does not constitute rectification within the meaning of the Internal Revenue Code.

Thus there are conflicting representations by counsel. Appellant trusts that now that this error, which doubtless was inadvertent, has been called to his attention, government counsel will acknowledge it regardless of any other grounds which he may advance in opposition to this motion. But so that the court may know the basis of appellant's representation, an affidavit on the point is printed as an appendix.

The affidavit so referred to reads:

I, GEORGE J. SOLOMON, being first duly sworn depose and say:

During the week of July 9, 1951 this office received a letter from the office of Mr. George Tuttle requesting that if possible we obtain from the Bureau of Internal Revenue a ruling to the effect that the reduction in proof of rum solely by the addition of water did not constitute "rectification" within the meaning of the Internal Revenue Code.

At the request of Mr. Wallace M. Cohen, a partner in this office, I contacted Mr. James H. Landis of the Alcohol Tax Unit. I explained the circumstances of my call to Mr. Landis, and in answer to my question he stated that the Bureau's position was clear, and that reduction in proof of rum solely by the addition of water did not constitute rectification within the meaning of the Internal Revenue Code.

I asked Mr. Landis if I could obtain a written statement to this effect. He said that I could, and suggested that I write to Deputy Commissioner Mealey giving him the problem and requesting a ruling. Mr. Landis stated that such a letter would be referred to him since he (Mr. Landis) handled rectification matters.

Several days later this office received a reply from Commissioner Mealey stating that it would be unbecoming for the Bureau of Internal Revenue to provide us with a statement on a question pending in the Court of Customs and Patent Appeals since the Department of Justice was there representing the interests of the Government.

On July 23 I called Mr. Landis again. He stated that the letter we had received from the Bureau had not been prepared by him, but was written on the advice of the legal staff. He reaffirmed that the Bureau's position however, was that reduction in proof of rum solely by the addition of water was not rectification.

I am familiar with the facts above stated and to the best of my knowledge and belief all such facts are true and no statement made herein is either incorrect or misleading.

It will be observed that the affidavit of Mr. Solomon is in no way related to the instant case. The "office of Mr. George Tuttle" requested Mr. Solomon to obtain a ruling which, had it been made, might or might not have affected the Internal Revenue tax upon importations of rum made subsequent to the ruling. The court, having studied the affidavit, realized that it meant nothing so far as this case is concerned.

Nothing herein said should be construed as indicating that this court properly may consider as evidence matters which should have been but were not presented before the trial court.

The petition to reopen consideration of the case is granted to the extent necessary to correct, or explain, the phases of our decision of June 26, 1951, as herein they have been corrected or explained.

It is refused so far as it seeks revocation of the denial of the petition for rehearing.

The appeal insofar as it relates to so-called gold rum is dismissed, it having been abandoned in that respect as hereinbefore related.

In all other respects the original judgment is *reaffirmed*.